FILED
2017 Mar-20  PM 01:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF LABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHRISTY ANNETTE MWANGI, | ) | |
| | ) | |
| CLAIMANT, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:15-CV-1895-KOB |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| RESPONDENT. | ) | |
| | ) | |

MEMORANDUM OPINION

I. INTRODUCTION

On August 1, 2012, the claimant, Christy Annette Mwangi, protectively applied for disability and disability insurance benefits under Titles II and XVI of the Social Security Act. (R. 148, 274). In both applications, the claimant alleged disability beginning on July 1, 2012, because of fibromyalgia, depression, anxiety, chronic back pain caused by a bulging disc, nerve pain in her legs, and arthritis in her knee. (R. 38-39, 161). The Commissioner denied the claims on October 3, 2012.  The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on January 13, 2014. (R. 37).

In a decision dated March 21, 2014, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for social security benefits. (R. 15). On August 28, 2015, the Appeals Council denied the claimant's

1

requests for review. (R. 1-6). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner to the ALJ for reconsideration.

## II. ISSUES PRESENTED

Whether the ALJ erred in the weight he gave to the opinions of the claimant's treating physician Dr. Toumah Sahawneh and examining, consulting physicians Dr. Alan Blotcky and Dr. Rex Harris because substantial evidence did not support the ALJ's findings.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No…presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions,…but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

3

than 12 months…." 42 U.S.C. § 423(d)(1)(A). To make this determination the

Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520,

416.920.

## V. FACTS

The claimant was thirty-eight years old at the time of the ALJ's final decision (R.

44); had completed sixth grade, but did not obtain her GED (R. 46-57); has past relevant

work as a certified nurse's assistant, fast food worker, and waitress (R. 26); and alleges

disability based on fibromyalgia, depression, anxiety, chronic back pain, nerve pain in her

legs, and arthritis in her knee.

### *Physical and Mental Impairments*

The claimant presented to the Emergency Department at Trinity Medical Center

on November 10, 2009 after falling down stairs in her home and injuring her right knee,

describing her pain as "constant, sharp, [and] throbbing" and assessing her pain as an

eight out of ten on the pain scale. Dr. Jeremy Rogers ordered an x-ray of claimant's knee,

---

[1] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

which showed no acute facture or dislocation.  Dr. Rogers diagnosed the claimant with
acute tendonitis in the right knee and prescribed Ibuprofen 800 mg and Darvocet as
needed for pain.  (R. 496-507).

On February 1, 2010, the claimant returned to the Emergency Department at
Trinity Medical Center complaining of a severe, sharp pain in her lower back.  The
claimant, who was thirteen weeks pregnant, stated that she lifted a heavy man off the
floor at work and felt a sharp pain in her lower back about ten minutes later.  She
assessed her pain as a nine out of ten on the pain scale. Dr. Samuel Flowers prescribed
the claimant Acetaminophen/Oxycodone as needed for severe pain and Cyclobenzaprine
for muscle spasms.

The claimant again sought treatment on November 18, 2010 at the Emergency
Department at Trinity Medical Center for intense pain in her left buttock, radiating to her
left leg, side of her foot, and toes.  She had given birth eleven weeks prior via a C-section
and an epidural.  At this visit, she complained of numbness and tingling on her left side
that intensified with standing, and stated that nothing relieved her pain.  Dr. Flowers
noted that the claimant's back had "tenderness to palpation over lumbar spine," and that
she experienced pain while flexing and extending her back and while laterally bending to
her left side.  Dr. Flowers ordered an MRI that revealed no acute fractures but showed a
bulge at L5-SI that did not cause any "significant mass effect."  Dr. Flowers prescribed
the claimant Acetaminophen/Oxycodone as needed for pain and Norflex as needed for
muscular pain.  (R. 401-411).

On February 8, 2011, the claimant presented to Trinity Medical Center for
physical therapy, complaining of muscle spasms and back pain and assessing her daily

pain as an eight out of ten on the pain scale.  The claimant stated that she had pain standing and rolling over onto her back, and that she could stand less than five minutes, sit less than fifteen minutes, and walk less than five minutes.  Physical Therapist Debbie King noted that the claimant had abnormal muscle tone; decreased range of motion; and limitations in her activities of daily living.  Although Ms. King scheduled physical therapy for the claimant two to three times a week through April 8, 2011, the claimant did not show up for several sessions, and the February 8, 2011 notes are the only ones for physical therapy in the record.  (R. 382-396).

The claimant sought treatment with Dr. Toumah Sahawneh at the Baptist Health Center in Oneonta on October 3, 2011 for back and leg pain.  Dr. Sahawneh noted tenderness and muscle spasms in the claimant's lower back. The claimant reported that her medications make her sleepy and she cannot work.[2]

From December 22, 2011 through May 8, 2012, the claimant saw Dr. Sahawneh six times, each time complaining of chronic back, leg, knee, and foot pain, along with muscle spasms.  The claimant reported on February 2 and May 8, 2012 that her pain was getting worse, despite taking Lortab for pain.  (R. 553-566).

The claimant saw Dr. John Smith at Baptist Health Center on June 27, 2012, complaining of back pain.  Dr. Smith noted that the claimant had back pain for the past two years, and that a 2010 MRI showed a bulging disk in her back.  The claimant's medications at the time of this visit were Neurontin, Mobic, Lortab, and SOMA.  Dr. Smith noted tenderness in the claimant's back at the sacrum and both "SI joints" and

---

[2]  Dr. Sahawneh notes a "medication log" on the claimant's treatment notes, but the record does not contain such a log for any of the claimant's visits with Dr. Sahawneh. Therefore, the court is unsure to which medications the claimant refers.

prescribed Dexa and Medrol, both anti-inflammatory medications.  He also told the claimant to continue the Lortab as needed for pain.  Dr. Smith ordered another MRI of the lumbar spine if the claimant was not better in one week.  (R. 549).

On July 6, 2012, the clamant returned to Dr. Sahawneh for a follow-up complaining of back, knee, and ankle pain, in addition to swelling; she reported tenderness in her legs and back, along with muscle spasms.  Dr. Sahawneh's clinical impression included chronic pain in her back and knees.  The claimant underwent an MRI later that afternoon that showed no abnormalities in her spinal cord or nerve root, no stenosis of the spinal canal, and no evidence of injury.  (R. 540, 547-548).

The claimant sought treatment with Dr. Sahawneh on August 6, 2012 because of pain in her back, right hip, knee, and leg.  Dr. Sahawneh noted that the claimant's right knee was "almost unstable"; ordered an x-ray of that knee; and told her to resume taking Mobic if the pain continued.  (R. 545-546).

The claimant returned to Dr. Sahawneh on August 24, 2012 because her right leg and knee gave way and she fell on the floor.  Dr. Sahawneh noted that the claimant had an abnormal gait; had tenderness in her back; and might benefit from an epidural block.  Under "Clinical Impression," Dr. Sahawneh indicated "? Fibromyalgia."  (R. 543-544).  At a follow-up with Dr. Sahawneh on September 6, 2012, the claimant continued to complain of back, right knee, leg, and hip.  Again, his clinical impression included "? Fibromyalgia."

At the request of the Social Security Administration, the claimant completed a "Function Report-Adult" on September 6, 2012.  In that report, the claimant stated that she takes pain medication in the morning to "get going"; she and her mom get the kids

ready for school; and then she goes back to rest because she does not sleep well at night. She reported that her pain gets worse if she does not take it easy; she helps her kids with homework "as much as [she] can"; her mom fixes dinner because she cannot stand long; the claimant feeds her kids by "fix[ing] their plates"; and her mom helps with baths because the claimant cannot bend over the tub without pain.  The claimant stated that she experiences pain when she bends her legs to put on her pants; when she bends over in the shower to wash her legs and feet; and when she bends her legs to shave them.  She can fold clothes "maybe 2X a week"; she does not do house or yard work because it hurts her back and legs; and she and "her mom go get groceries" once a week.  Her mom pays the bills; the claimant cannot handle a savings account; and she cannot use a checkbook.  The claimant indicated that she does not spend time with others and does not go out anymore because of her pain.  (R. 335-42).

Regarding her abilities, the claimant stated in her Function Report that she can lift five or six pounds; cannot squat without falling; has pain when bending or standing too long; cannot walk long distances; has pain when she sits; has pain when she bends her knees; and cannot climb stairs because doing so hurts her legs.  She can walk a few feet and then must rest thirty to forty-five minutes before she walks again.  The claimant stated that she cannot pay attention long; does not finish what she starts; can follow spoken instructions "ok"; does not get along with authority figures; does not handle stress well; does not handle changes in routine well; and experiences fear about her difficult delivery of her baby that included a blood transfusion. Her medications affect her memory, completion of tasks, concentration, understanding, and ability to hold things with her hands.  (R. 335-42).

On September 9, 2012, the claimant's mother, Kathy Roberts, also completed a "Function Report-Adult-Third Party" that was similar to the report completed by the claimant. Ms. Roberts explained that she helps the claimant with her children in many ways, including getting them ready for school; helping them with their homework; getting them ready for bed; and feeding them. Ms. Roberts explained that she carries the laundry to the couch for the claimant to fold the clothes; that the claimant only goes to the doctor and the store "sometimes"; and that the claimant needs someone to accompany her "depending on how bad she's hurting." According to Ms. Roberts, the claimant does not get along well with others "if they get on her nerves"; has no social activities; and does not pay attention or follow written or spoken instructions very well. (R. 125-33).

The claimant returned to Dr. Sahawneh on October 5, November 5, December 5, 2012, and on January 8, 2013, complaining of continued back, knee, and leg pain. The claimant reported that she had "more tingling"; that she was numb in her left ankle and toes; and that she was nervous and depressed. Dr. Sahawneh's clinical impressions included chronic pain and "? Poss Fibromyalgia." He also referred the claimant to Dr. Archana Jain for a rheumatology assessment. (R. 572-73, 581-85).

On December 15, 2012, Dr. Sahawneh completed a "Physical Capacities Evaluation," indicating that the claimant could lift five pounds occasionally and one pound frequently; occasionally perform gross and fine manipulation; and occasionally work around environmental problems (allergies, dust, etc.). He stated that the claimant could rarely push and pull, climb stairs, bend, stoop, reach overhead, and operate motor vehicles. Dr. Sahawneh reported that the claimant could never work with or around dangerous machinery and would be likely to miss more than four days a month because

of her impairments, specifically noting her Fibromyalgia.  He also assessed that the claimant's pain is "to such an extent as to be distracting to adequate performance of daily activities of work"; that physical activity increases her pain to the extent that bed rest and/or medication is necessary; and that the side effects of her medications are totally restrictive and cause the claimant to be unable to function at a productive work level.  (R. 575-76).

In his evaluation, Dr. Sahawneh indicated that the claimant had marked or extreme limitations in her ability to interact appropriately with others; get along with co-workers or peers; perform her daily activities, such as working around the house and socializing with friends; understand, remember, and carry out simple or complex instructions; do repetitive tasks; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance or be punctual; sustain a routine without special supervision; complete a normal workday or workweek without interruptions because of her impairments; and make simple work-related decisions; respond appropriately to supervision, changes in work setting, or customary work pressures.  (R. 577-79).

The claimant returned to Dr. Sahawneh on February 7, 2017, complaining of back pain and inability to sleep.  His clinical impressions during this visit were chronic pain in her spine, "fibromyalgia," and insomnia.  He noted that she had an appointment with a rheumatologist in a week.

Upon Dr. Sahawneh's referral, the claimant saw Dr. Jain for a rheumatology consultation on February 14, 2013.  Dr. Jain noted that the claimant has had constant lower back, buttock, knee, leg and feet pain for three years after the birth of her last child;

that nothing totally relieves the pain; that the pain worsens with activity and gets better with rest; that she has had "no good results" with Lortab; that Gabapentin helps with her leg pain; and that Klonopin helps her rest at night.  The claimant reported fatigue, decreased activity, confusion, tingling, memory loss, anxiety, and depression.  (R.  588).

Dr. Jain's physical examination of the claimant revealed good hand grip; tenderness in her hips; no tenderness or instability in her knees; tenderness in her L1-2 region in her back and in her tailbone area; and decreased flexion and extension in her back.  X-rays revealed a "focal rounded/elliptical area of sclerosis. . . within the proximal left femoral diaphysis, likely a bone island"; mild degenerative changes noted at L5-S1, with normal alignment; mild, multilevel discogenic degenerative changes in the thoracic spine, with normal alignment and no acute abnormality; no acute facture, dislocation, or abnormality of either knee; and normal hands and feet with no evidence of inflammatory arthropathy. Noting the claimant's muscle pain, Dr. Jain wrote "Consider fibromyalgia vs referred pain sec[ondary] to coccyx pain."  Dr. Jain diagnosed the claimant with Arthropathy NOS, multiple sites.  (R. 589-601).

The claimant saw Dr. Sahawneh for follow-up appointments for her back pain on April 4, April 30, May 21, May 29, June 27, July 25, August 15 and September 12, 2013. Those treatment records indicate that the claimant continued to have chronic pain, tenderness, and muscle spasms in her back and continued to take Lortab and Klonopin. On July 25, Dr. Sahawneh ordered an epidural block that the claimant reported helped for a few days.  During the September 12 visit, the claimant complained of muscle "jerks" waking her up at night.  (R. 603, 618-29).

At the request of the Social Security Administration, the claimant saw Dr. Rex Harris for a physical assessment on October 10, 2013. The claimant told Dr. Harris that she has anxiety, depression, back pain, fibromyalgia, left leg pain and general all over pain, and that she "essentially rests all the time." Dr. Harris noted that Dr. Sahawneh, chronic pain specialist who treated the claimant for two years, prescribed her Klonopin, Lortab, Gabapentin, Zanaflex, Zoloft, and Neupro. The claimant told Dr. Harris that her past MRI of her back and x-rays of her knees were normal despite her complaints of pain. (R. 610).

Dr. Harris' physical examination of the claimant revealed a full range of motion in her neck, shoulders, elbows, wrists, and fingers; 4 out of 5 bilateral grip; and normal sensation, reflexes, and muscle groups in her upper extremities. The claimant's lumbar flexion was "60 degrees, extension [was] 10, lateral motion [was] 10"; she had full range of motion in her hips, knees, and ankles; and she had "tenderness to palpation in her left knee, with no heat, redness, or effusion." Her lower extremities had normal reflexes and sensation; her straight leg test was negative; her gait was normal; and she could "toe and heal walk, squat and arise *with difficulty*." (R. 610) (emphasis added).

Dr. Harris noted the claimant's diagnoses of anxiety, depression, and fibromyalgia, and opined that she was capable of sedentary work. He assessed that the claimant could occasionally lift up to ten pounds but never lift over that amount; could occasionally carry up to ten pounds but never carry over that amount; sit and stand for ten minutes at a time; walk for five minutes without interruption; could sit for a total of three hours, stand for a total of two hours, and walk for a total of one hour in an eight-hour work day, but needed to rest for two hours during that time period; could occasionally

reach overhead; could frequently handle, finger, feel and push/pull with either hand; could occasionally operate foot controls with either foot; should never climb stairs, ramps, ladders, or scaffolds; should never balance, stoop, kneel, crouch, or crawl; should never work in unprotected heights or with moving parts; should never operate a motor vehicle; and could occasionally work around dust, fumes or in extreme cold or heat.  He also noted that she can shop; walk a block at a reasonable pace; use public transportation; climb a few steps with a single hand rail; prepare simple meals and feed herself; care for her personal hygiene; and sort, handle, and use paper and files.  (R. 611-16).

Dr. Alan Blotcky performed a psychological evaluation of the claimant on October 21, 2013 at the request of the Social Security Administration. Dr. Blotcky noted that the claimant's medical history included fibromyalgia, persistent pain in her tailbone, and persistent pain in her back and both legs because of degenerative disc disease.  The claimant reported that her first husband physically abused her; that she has experienced major depression for the last eight months because of her medical problems; that she had two prior major depressive episodes in 2001 and 2007 and took Effexor and Ablify, respectively during these episodes; and that her current symptoms included sadness, crying, hopelessness, worrying, lethargy, irritability, impaired concentration, diminished interest in activities, social withdrawal, weight loss, disturbed sleep, and suicidal ideation. The claimant told Dr. Blotcky that she spends most of her time watching television and resting; does not cook or do housework; has no hobbies or special interests; has a driver's license but has not driven in six months; has no close friends; and does not socialize with family.  (R. 635-36).

During his mental exam of the claimant, Dr. Blotcky noted that she was "quite depressed"; had limited attention and concentration; could count five digits forward and three digits back; could spell "world" backward; could not do serial sevens; could add and subtract; made an error in making simple change; had a fair fund of information; had good memory; had fair abstract thinking; and had intellectual abilities in the low average range.  She had logical and orderly thought processes, no signs of psychosis, and fair insight.  (R. 636).

Dr. Blotcky diagnosed the claimant with major depressive disorder, recurrent, severe; low average intellectual abilities; and persistent pain associated with fibromyalgia and degenerative disc disease.  Dr. Blotcky found that the claimant had marked limitations in her ability to interact appropriately with the public; interact appropriately with supervisors; and respond appropriately to usual work situations and changes in the work setting.  He indicated that she "must be involved in psychiatric treatment on a regular and uninterrupted basis"; that she needs the care of a psychiatrist and psychologist; that her treatment should include medication and individual counseling; and that her current treatment with Klonopin "has not been effective."  Dr. Blotcky stated that the claimant was motivated during the exam, but her prognosis was "poor to very poor because of her recurrent affective illness" and her medical conditions. (R. 637, 640).

### The ALJ Hearing

The ALJ initially scheduled a hearing on October 31, 2013, but the claimant did not show for the hearing.  The claimant's attorney at the administrative level, Joseph Campbell, reported to the ALJ that the claimant's mother informed him that the claimant

was in the hospital because of her fibromyalgia, and then later informed him that the claimant had the flu.  The ALJ agreed to continue the hearing. (R. 90-96).

On November 6, 2013, Mr. Campbell submitted a letter to the ALJ advising him that the claimant called Mr. Campbell on November 4, 2013 and told him that she was not in the hospital on October 31, 2013, but instead had been incarcerated on that day and released on November 2, 2013.  Mr. Campbell noted in the letter that the claimant's family members had told him that the claimant had been in the hospital and that the claimant contacted him on her own volition after her release. (R. 372).

At the re-scheduled hearing on January 13, 2014, the ALJ asked the claimant about why she missed the October 31, 2013 hearing.  The claimant stated she was in jail for shoplifting clothes and that her mother told her attorney that she was in the hospital because "maybe they thought I'd be in more trouble with my disability. I guess they thought they were looking out for me."  The claimant stated that when she found out that her mother told her attorney that the claimant was in the hospital, she called her attorney to let him know that she had not been in the hospital.  (R. 52-53, 74).

The claimant testified that she lives with her sister and four children and that her sister pays the rent.  Her sister usually drives her around, but the claimant will pick up the children from school sporadically.  (R. 45-46).

Regarding why she can no longer work, the claimant testified that her anxiety makes her very nervous in public.  The claimant stated that she complained to Dr. Sahawneh about her anxiety and depression, and he prescribed medication.  She said she has received no individual counseling or inpatient hospitalization for her anxiety, but Dr. Sahawneh did not tell her to go to a therapist or psychiatric doctor.  She has a hard time

15

paying attention and following a conversation; easily loses focus and gets distracted; cannot "comprehend stuff" and must have information repeated; and does not get along well with others because people "get on [her] nerves."   (R. 53, 56-62, 73).

When asked about her pain, she stated that she hurts when walking, bending, and doing normal daily activities and that her pain on a normal day is an eight out of ten on the pain scale.  She testified that she has pain in both legs, but mostly in her right leg all the way down to her foot.  The pain gets worse when she is more active, and lying down and resting help relieve the pain.  When her pain is too much, her daughter has to tie the claimant's shoes and help her wash her feet. She stated that she cannot reach overhead; has trouble sleeping because of pain; and needs help getting out of the shower.  (R. 58-62, 72).

The claimant testified that she took Gabapentin for neuropathy; Klonopin for anxiety; Neupro patch for her restless leg syndrome; Percocet for back pain; and Zanaflex for muscle spasms.  She testified her mediations help but they make her very drowsy, causing her to nap a couple of hours during the day.  She had two epidural injections, but they only relieved the pain for about a week; tried physical therapy but it did not help; and walks with a cane that Dr. Sahawneh "told her to use."   (R. 53-56, 70-71).

Regarding her daily activities, the claimant testified that her sister cooks, but the claimant fixes her children's plates and sets the table; her sister cleans the house but the claimant can fold clothes; her daughter washes the dishes; and her brothers help with the home repairs.  The claimant stated that she "sometimes" get out of the house to go grocery shopping, but that normally her sister does the shopping; that she does not go out to eat, to visit people, or to church; that she does go to band events and teacher's

conferences for her children; and "sometimes" she and her sister take the children to stores.  She cannot pick up her three-year-old child, and, when her pain is bad, her sister steps in for her in caring for the kids "a pretty good bit."  When her sister has to work during the day, the claimant testified that her mother comes over to help the claimant. The claimant stated that she helps her kids with their homework "as much as I can."  (R. 63-67).

 A vocational expert, Mary H. Kessler, testified concerning the type and availability of jobs that the claimant was able to perform. Ms. Kessler testified that the claimant's past relevant work was as a certified nurse assistant, classified as medium, semi-skilled work; a waitress, classified as light, semi-skilled work; and a fast food worker, classified as light, unskilled work.  (R. 76-77).

The ALJ asked Ms. Kessler to assume an hypothetical individual the same age, education, and experience as the claimant who can lift, carry, push, and pull at a light exertional level; needs a sit/stand option to relive pain; can walk short distances up to a block; can occasionally use foot controls bilaterally; can use hand controls frequently; can frequently reach overhead bilaterally; can never climb stairs, ramps, ladders, or scaffolds; can frequently balance but occasionally stoop, kneel, and crouch; can never crawl; cannot be exposed to unprotected heights, dangerous machinery, dangerous tools, or hazardous processes; can tolerate occasional exposure to extreme heat and cold conditions; can tolerate moderate noise level in the workplace; can remember only short simple instructions; cannot deal with detailed, complex instructions; can have no more than occasional contact with general public or co-workers; can have frequent interaction with supervisors; must be limited to simple, work-related decisions; can accept

17

constructive, non-confrontational criticism; can work in a small group setting; can accept

gradual and infrequent changes in the work setting; cannot perform at a production rate

pace; can perform goal oriented work; and only needs breaks that normal work day

breaks could accommodate.  Ms. Kessler responded that hypothetical person could not

perform the claimant's past work because of the sit/stand option.  (R. 77-79).

The ALJ asked Ms. Kessler if other jobs existed in the region or nation that the

hypothetical individual could perform. Ms. Kessler replied that the hypothetical

individual could perform work as a general office clerk, classified as light exertion,

unskilled work, with 2,800 jobs in Alabama and 359,000 in the nation; a general office

clerk, classified as sedentary exertion, unskilled work, with 1,200 jobs in Alabama and

103,400 jobs in the nation; and an order clerk, classified as sedentary exertion, unskilled

work, with 1,500 jobs in Alabama and 117,100 in the nation.  (R. 79).

In his second hypothetical, the ALJ asked Ms. Kessler to assume all of the prior

limitations in addition to the individual requiring as assistive walking devise to ambulate.

Ms. Kessler testified that individual could not perform the claimant's past work, but

could work as the sedentary general office clerk and the sedentary order clerk previously

discussed, and as a surveillance system monitor, classified as sedentary, unskilled work,

with 500 jobs in Alabama and 80,000 in the nation.  (R. 80-81).

The ALJ's last hypothetical asked Ms. Kessler to assume the limitations in the

first two hypotheticals and the additional limitation that, because of a "combination of

medical conditions associated with severe pain and mental impairment, this individual

would be unable to sustain sufficient concentration, persistence and pace to do even

simple tasks for an eight-hour day, 40-hour week, on a regular, continuing basis."  Ms.

Kessler stated that individual could perform no work.

The claimant's attorney then presented a hypothetical including the limitations found in Dr. Sahawneh and Dr. Blotcky's opinions. Ms. Kessler stated that no jobs existed for an individual with those limitations.

*The ALJ's Decision*

On March 21, 2014, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 15). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in substantial gainful activity since her alleged onset date of July 1, 2012. (R. 17).

Next, the ALJ found that the claimant had the severe impairments of major depressive disorder, recurrent, severe; anxiety; degenerative disc disease at L5-S1; and polyarthropathy, which is arthritis involving five or more joints simultaneously. The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17-18).

The ALJ considered whether the claimant met the criteria for Listings 1.02 and 1.04, involving musculoskeletal disorders. He also considered her mental disorders under Listings 12.04 and 12.06, but concluded that the claimant only had mild restrictions in her daily living and social functioning and moderate limitation in her ability to maintain concentration, persistence, or pace. To support his conclusion, the ALJ noted the claimant's September 2012 Function Report in which she stated she could shop weekly

for groceries, could travel by driving, went to her children's band events and conferences, watched TV weekly; and could care and shop for her children.  (R. 18-19).

Next, the ALJ determined that the claimant has the residual functional capacity to perform light work with the following non-exertional, function limitations: must have a sit/stand option to relive pain; can walk short distances up to a block; can occasionally use foot controls bilaterally; can use hand controls frequently; can frequently reach overhead bilaterally; can never climb stairs, ramps, ladders, or scaffolds; can frequently balance but occasionally stoop, kneel, and crouch; can never crawl; cannot be exposed to unprotected heights, dangerous machinery or tools, or hazardous processes; can tolerate occasional exposure to extreme heat and cold conditions; can tolerate moderate noise level in the workplace; should never operate commercial motor vehicles; can tolerate occasional exposure to extreme heat and cold; can remember only short simple instructions; cannot deal with detailed, complex instructions; can have no more than occasional contact with general public or co-workers; can have frequent interaction with supervisors; must be limited to simple, work-related decisions; can accept constructive, non-confrontational criticism; can work in a small group setting; can accept gradual and infrequent changes in the work setting; "would be able to  perform at a production rate pace as required for assembly line work";[3] can perform goal oriented work; and  needs only normal work day breaks to accommodate her time off task.  (R. 19-20).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that, although the claimant's

---

[3]   Although the ALJ indicated the claimant could perform at a production rate pace in his RFC determination, the court believes this sentence contains a typographical error given his other findings and his hypothetical to the vocational expert at the hearing. *See* (R. 78). This sentence should read "could not perform at a production rate . . . ."

medically determinable impairments could reasonably be expected to cause her symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible when compared with the evidence. Specifically, the ALJ noted that objective medical evidence only showed "minimal disc bulge at the L5-S1 level" with no "significant mass effect" and only "mild degenerative changes at L5-S1." He also stated that the claimant had a normal gait; a negative straight leg raising test; and a normal 2012 lumbar spine MRI. (R. 21-22).

The ALJ recounted Dr. Sahawneh's findings and gave him partial weight because of his "long treatment relationship" with the claimant. However, the ALJ found that Dr. Sahawneh's severe restrictions were "inconsistent with the claimant's lack of inpatient psychiatric hospitalizations; her lack of counseling or psychiatric treatment; and her extensive activities of daily living." (R. 23, 25).

Citing the same reasons as he gave for discrediting Dr. Sahawneh's opinion, the ALJ gave examining consultant Dr. Blotcky only partial credit. The ALJ noted that Dr. Blotcky seemed to base the extreme limitations on the "claimant's subjective complaints and appearance, instead of the limited treatment records and psychiatric records." The ALJ stated that Dr. Blotcky's findings were inconsistent with the "limited objective evidence in the record" and with claimant's activities of daily living.

Regarding her activities of daily living, the ALJ noted that the claimant admitted that she feeds her children; takes care of her children's needs; cares for her hair; feeds herself; "uses the toilet independently"; folds clothes; travels by driving; shops weekly for food; goes to her children's band events and teacher conferences; and shops for her kids. The ALJ stated that the claimant's own "description of her daily activities are

representative of a fairly active and varied lifestyle and not indicative of a significant restriction of activities or constriction of interests."  (R. 24-26).

Additionally, the ALJ noted the inconsistency involving why the claimant did not attend the first hearing, noting that the attorney advised the ALJ that the claimant was in the hospital but that the claimant testified at the second hearing that she was in jail for shoplifting.  The ALJ stated that "[w]hile this inconsistently may not have been the product of conscious or intentional attempt to mislead on the part of the claimant, it nonetheless weighs negatively on her overall credibility."  (R. 25).

The ALJ also gave Dr. Harris, a consultative examiner, partial weight after considering Dr. Harris' opinion in detail.  He found that Dr. Harris' opinion is "inconsistent with his findings on examination showing the claimant's gait was normal; she could toe and heel walk, squat, and arise *without* difficulty; she had negative straight leg raising bilaterally, and muscle groups were 5/5 in the upper extremities."  The ALJ also noted that the mild objective findings in the record did not support Dr. Harris' assessment that the claimant has severe functional limitations.  (R. 26) (emphasis added).

Next, the ALJ, relying on the vocational expert's testimony, found that the claimant is unable to perform any of her past relevant work. The ALJ determined that based on the claimant's age, education, work experience, residual functional capacity, and the vocational expert's testimony, jobs existed in significant number in the national economy that the claimant could perform, including working as a general office clerk at both the light and sedentary level and as an order clerk at the light exertional level. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act.  (R. 27).

# VI. DISCUSSION

The claimant argues that the ALJ erred in the partial weight he gave to the claimant's treating physician Dr. Sahawneh and examining, consulting physicians Dr. Blotcky and Dr. Harris because substantial evidence does not support his findings.  This court agrees.

The ALJ must state with particularity the weight given different medical opinions and his reasons, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Moreover, substantial evidence must support the factual basis on which the ALJ bases the weight he gives a medical opinion.  *See* 42 U.S.C. § 405(g).

The ALJ must give the testimony of a *treating physician* substantial or considerable weight unless "good cause" is shown to the contrary. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004). The Commissioner may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). Even if the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, but substantial evidence does not support those reasons, the ALJ commits reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).  Such is the case here.

*Dr. Sahawneh and Dr. Blotcky's Opinions*

In the present case, the court finds that substantial evidence does not support the reasons the ALJ gave to discredit the opinions of Dr. Sahawneh and Dr. Blotcky.  The ALJ stated that he gave their opinions *partial* weight because they are inconsistent with the claimant's admission of her daily activities in her 2012 Function Report.  The facts

that she can use a toilet by herself, care for her hair, feed herself, fold clothes, and travel by car occasionally do not negate the claimant's chronic pain that would prevent her from working a normal workday.  The claimant does not claim to be an invalid who cannot do anything at all for herself, but instead claims that her chronic pain severely limits her ability to work a normal workday.  Contrary to the ALJ's finding, the ability to perform these types of simple or occasional activities does not reflect someone who necessarily could work a normal eight-hour work day or someone who lives a "fairly active and varied lifestyle."

Additionally, the ALJ disregards the facts that show that the claimant folds clothes only twice a week; her mom brings her the clothes to fold because she cannot carry the laundry basket; that her mom and sister help the claimant get groceries once a week, but that normally her sister does the shopping; that her mom pays the bills; that the claimant has no social activities and does not go out to eat, to church, or to socialize; and that her sister usually drives her around when the claimant goes out occasionally.  The ALJ focused on a few activities the claimant could do occasionally and disregarded those daily activities with which she needs help and cannot do by herself.

Moreover, the ALJ based his findings regarding Dr. Sahawneh and Dr. Blotcky's opinions on the facts that the claimant can feed her children, take care of her children's needs, attend their band events and teacher's conferences, and shop for them.  However, the ALJ ignores the facts in the record that show that the claimant's mom or sister helps her get the children ready for school; that her mom or sister cooks the meals but the claimant simply "fixes" the children's plates and sets the table; that her mom helps the children bathe because the claimant cannot bend over the tub without pain; that the

claimant's daughter has to tie the claimant's shoes and help her wash her feet; that the claimant cannot pick up her three-year-old child; and that the claimant's sister has to "step in" and take care of the children "a pretty good bit" because of the claimant's pain. Just because the claimant goes to an occasional band performance for her children or attends a parent-teacher conference on a very limited basis does not mean that the claimant does not have chronic pain daily that would prevent her from completing a typical eight-hour work day.  Contrary to the ALJ's finding, the substantial evidence in the record reflects that the claimant *cannot* take care of her children alone and needs help to meet their basic needs because of her pain.

Moreover, the claimant completed her Function Report in 2012, a little over a year *before* Dr. Blotcky's examination of the claimant in 2013.  During Dr. Blotcky's examination, the claimant indicated that her depression had worsened in the eight months prior because of her pain; that she had social withdrawal and had no close friends; that she had not driven anywhere in six months, and that she had suicide ideation. The record shows that, as the claimant's pain worsened, so did her mental health, and Dr. Blotcky acknowledged that her prognosis was "poor to very poor because of her recurrent affective illness."  Not only did the ALJ fail to take into account that the claimant needs help to complete her daily activities, he also failed to consider that the claimant's mental condition worsened between the time she completed her Function Report in 2012 and Dr. Blotcky's evaluation in 2013.

The ALJ also found that Dr. Sahawneh and Dr. Blotcky's opinions were inconsistent with the claimant's lack of psychiatric hospitalizations and psychiatric counseling and treatment.  However, Dr. Sahawneh treated the claimant's depression and

anxiety with medications for several years, and the ALJ found her depression to be a severe impairment. According to the claimant, Dr. Sahawneh never told her to pursue other forms of mental health treatment with other specialists.  The facts that the claimant was not hospitalized and did not receive counseling for her depression and anxiety do not constitute substantial evidence that she in fact did not have the severe limitations espoused by both doctors.

Dr. Sahawneh treated the claimant for years for her alleged severe pain, and his opinion took into account his long-term treatment of her and his knowledge of the severity of her physical and mental conditions.  The Social Security regulations explain that an ALJ must give treating sources more weight because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Dr. Sahawney, as the claimant's treating physician for many *years*, was in the unique position to give his opinion about the severity of the claimant's physical and mental conditions.

Dr. Blotcky also personally examined the claimant and assessed his opinion based not only on the claimant's subjective statements, but also on his personal observation of the claimant and on his expertise in evaluating patients with mental impairments.  As a specialist in the mental health field to whom the Social Security Administration refers many claimants, Dr. Blotcky assessed the claimant with severe limitations without recommending that she receive inpatient hospitalization. His assessment shows that his finding that the claimant has severe mental limitations is not mutually exclusive with the

claimant having no prior psychiatric hospitalizations   In fact, Dr. Blotcky pointed out that the claimant needed *more* mental health treatment on a consistent *outpatient* basis, and recognized that her physical impairments and chronic pain intensify her mental impairments.

The court finds that the ALJ's reasons for discrediting Dr. Sahawneh and Dr. Blotcky's opinions lack merit and substantial evidence does not support his findings.

*Dr. Harris*

The ALJ's reasons for discrediting Dr. Harris' opinion also lack merit and are based on a fact not in the record.  The ALJ also gave the opinion of Dr. Harris, a consultative examiner, partial weight because it is "inconsistent with his findings on examination showing the claimant's gait was normal; she could toe and heel walk, squat, and arise *without difficulty*; she had negative straight leg raising bilaterally, and muscle groups were 5/5 in the upper extremities."  (R. 26) (emphasis added). However, Dr. Harris' opinion actually says the opposite in that "she cold toe and heel walk, squat and arise *with difficulty*."  (R. 610) (emphasis added).

Therefore, the ALJ's finding based on an incorrect reading of the record cannot serve as substantial evidence to discredit Dr. Harris' opinion.

*Other Concerns*

The court is concerned that the ALJ's discredited the claimant based on statements her mother gave to the claimant's attorney about why the claimant did not attend the first hearing in 2013.  Her attorney made clear that the claimant did not tell him that she was in the hospital, and that, when the claimant found out her mother had told him that incorrect fact, the claimant immediately contacted her attorney to tell him where

she actually was on that date.  The claimant testified at the 2014 hearing truthfully about

why she did not attend the first hearing date, and the ALJ seemed to ignore that the

claimant herself did not lie to her attorney or the court that she was hospitalized and

could not attend the 2013 hearing.

The ALJ's residual functional capacity determination makes no concessions for

the side effects of the claimant's medications, and the ALJ fails to discuss how those side

effects might affect her ability to complete a normal workday.  The ALJ also did not

adequately discuss the claimant's fibromyalgia diagnosis and how that diagnosis might

affect his findings.

VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the

Commissioner is due to be REVERSED AND REMANDED.

The court will enter a separate Order in accordance with the Memorandum

Opinion.

DONE and ORDERED this this 20th day of March, 2017.


**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT
JUDGE